UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, *solely in its capacity as Trustee,*<br><br>Interpleader Plaintiff,<br><br>- against -<br><br>TRIAXX PRIME CDO 2006-1, LTD., TRIAXX ASSET MANAGEMENT LLC (f/k/a ICP ASSET MANAGEMENT LLC), SOUTH TRYON, LLC, GOLDMAN SACHS & CO., BLACKROCK FINANCIAL MANAGEMENT, INC., GOLDENTREE ASSET MANAGEMENT LP.<br><br>Interpleader Defendants. | : : : : : : : : : : : : : : : : : : | **INTERPLEADER COMPLAINT**<br><br>Case No._____ |

Interpleader Plaintiff U.S Bank National Association ("U.S. Bank" or "Trustee"),

as successor to Bank of America, National Association (successor by merger to LaSalle

Bank National Association ("LaSalle")), solely in its capacity as Trustee under the

Indenture, dated as of September 7, 2006, by and among its predecessor LaSalle, Triaxx

Prime CDO 2006-1, Ltd., as Issuer, and Triaxx Prime CDO 2006-1, LLC, as Co-Issuer (the

"Indenture")[1], alleges and states that:

**INTRODUCTION**

1.      The Trustee brings this interpleader action for the purpose of obtaining

adjudication of the respective rights of the Interpleader Defendants with respect to certain

Collateral Debt Securities held by the Trustee pursuant to the Indenture.  Pursuant to the

Indenture and Collateral Management Agreement (defined below), the Collateral Manager

(defined below) is responsible for supervising and directing the sale of Collateral Debt

---

[1] All capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Indenture.

Securities.  The Trustee has no responsibility regarding the selection of Collateral Debt Securities to be sold and acts solely upon the direction of the Collateral Manager in releasing its lien and custody of Collateral Debt Securities in connection with any sale of Collateral Debt Securities by the Collateral Manager, on behalf of the Issuer.

2.      Notwithstanding its circumscribed role, the Trustee finds itself caught in a dispute over the potential sale of certain Collateral Debt Securities held by it.  Certain of the Interpleader Defendants have stated or implied that, depending on whether such securities are sold, the Trustee could be named as a defendant in litigation.

3.      The Trustee therefore brings this action to obtain a judicial determination pursuant to the Collateral Management Agreement and the Indenture, as to (i) whether certain of the Collateral Debt Securities are Defaulted Securities, and if so (ii) whether the Collateral Manager is required to sell any such Defaulted Securities, and if so (iii) whether the Collateral Manager has discretion as to when such a sale should be effectuated.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties hereto and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      This Court also has subject matter jurisdiction over this action under 12 U.S.C. § 632 (the "Edge Act").  This action satisfies the requirements of section 632 because it was brought by U.S. Bank, a national banking association organized under the laws of the United States, and it arises out of banking activity with a distinct foreign aspect. Specifically, U.S. Bank provides corporate trust and other related services to, or on behalf of, the Issuer, which is organized under the laws of the Cayman Islands.  Thus, this action

arises out of the Trustee's execution of such services on behalf of a foreign issuer, which is an international banking activity.

6.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1397 because one or more defendants reside within this judicial district.

**PARTIES**

7.      Interpleader Plaintiff U.S. Bank, as Trustee under the Indenture, is a national banking association with its main office in Minneapolis, Minnesota.

8.      Upon information and belief, Interpleader Defendant Triaxx Asset Management LLC ("Triaxx" or the "Collateral Manager") is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of the State of Minnesota.  Triaxx serves as the Collateral Manager for the Issuer under the Indenture and the Collateral Management Agreement, dated September 7, 2006, by and between Triaxx Prime CDO 2006-1, Ltd. and ICP Asset Management LLC (the "Collateral Management Agreement").

9.      Upon information and belief, Interpleader Defendant South Tryon, LLC ("South Tryon") is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of the State of Minnesota.  Upon information and belief, South Tryon is a Holder of Class A-1 Notes.

10.      Upon information and belief, Interpleader Defendant Goldman Sachs & Co. ("GS&C") is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of the State of Minnesota.  Upon information and belief, GS&C is a Holder of Class A-2 Notes and Class B Notes.

11.     Upon information and belief, Interpleader Defendant GoldenTree Asset Management LP ("GoldenTree") is a limited partnership organized and existing under the laws of the State of Delaware, and none if its partners are citizens of the State of Minnesota. Upon information and belief, GoldenTree is a Holder of Class A-2 Notes.

12.     Upon information and belief, Interpleader Defendant BlackRock Financial Management, Inc. ("BlackRock," together with GS&C, GoldenTree and BlackRock, the "Objecting Noteholders") is a corporation incorporated in the State of Delaware, with its principal place of business in New York.  Upon information and belief, BlackRock is a Holder of Class A-2 Notes and Class B Notes.

13.     Interpleader Defendant Triaxx Prime CDO 2006-1, Ltd. is an exempted corporation organized under the laws of the Cayman Islands.  Triaxx Prime CDO 2006-1, Ltd. is the Issuer under the Indenture and the owner of the Collateral Debt Securities.

## BACKGROUND

14.     Pursuant to the Indenture, the Issuer issued certain Notes that are secured by a pool of Collateral Debt Securities and other Collateral.  The Notes were issued in five different classes, or tranches, each of which is entitled to the proceeds generated by the Collateral Debt Securities in a specified Priority of Payments.

15.     Pursuant to the Indenture, the Issuer pledged the Collateral Debt Securities and other Collateral to the Trustee, in order to secure the Issuer's obligations under the Indenture.  The Trustee holds the Collateral Debt Securities on behalf of the Noteholders and other Secured Parties under the Indenture, and receives and distributes the proceeds payable in respect of such Collateral Debt Securities.

16.     The Indenture sets forth various events that cause a Collateral Debt Security to become a Defaulted Security.  Section 1.01 of the Indenture provides that a Collateral Debt Security becomes a Defaulted Security in the event, among others, that it is "rated 'Ca' or 'C' by Moody's or is rated 'Caa3' by Moody's and is placed by Moody's on a watchlist for possible downgrade by Moody's" or "is rated 'CC,' 'D' or 'SD' or below (or had its rating withdrawn) by Standard & Poor's."  Indenture § 1.01.

17.     In the event that a Collateral Debt Security becomes a Defaulted Security, the Indenture provides that the Collateral Manager is required to use commercially reasonable efforts to solicit bids for the Defaulted Security and to direct the Issuer to sell the Defaulted Security to the highest bidder.

18.     Section 12.1(a)(ii) of the Indenture provides, in pertinent part, that the "Issuer (upon direction of the Collateral Manager to the Issuer and the Trustee) … shall sell (a) any Defaulted Security … within three years after such Collateral Debt Security became a Defaulted Security."  *Id.* § 12.1(a)(ii).  Moreover, Section 12.1(b) of the Indenture provides, in pertinent part, that the "Collateral Manager, on behalf of the Issuer, shall use commercially reasonable efforts to sell … each Defaulted Security … required to be sold pursuant to Section 12.1(a) … within the time periods … specified in Section 12.1(a)."  *Id.* § 12.1(b).

19.     In the event that a Defaulted Security is sold pursuant to Section 12(a)(ii) of the Indenture, the Trustee executes the sale by releasing the lien on the Defaulted Security and releasing such asset from its custody. *Id.* § 10.8(a).  The Trustee then deposits the Sale Proceeds in one of the Collections Accounts, *id.* § 10.8(d), and amounts in such

accounts are available for distribution to Noteholders and other Secured Parties in accordance with the Indenture's Priority of Payments. *Id.* § 10.2(g).

## THE DISPUTE

20.     The Monthly Reports and Note Valuation Reports prepared and distributed on behalf of the Issuer under the Indenture and sent to Noteholders and certain other parties identify certain Collateral Debt Securities as Defaulted Securities.

21.     On July 15, 2015, South Tryon, in its capacity as a Holder of Class A-1 Notes, sent a letter to the Collateral Manager demanding that the Collateral Manager immediately proceed with a sale of the Defaulted Securities identified in the May 26, 2015 Note Valuation Report, pursuant to Sections 12.1(a)(ii) and 12.1(b) of the Indenture. South Tryon stated that the Defaulted Securities consisted of one larger subset that became Defaulted Securities more than three years before the date of South Tryon's letter and another smaller subset that became Defaulted Securities within the last three years of the date of South Tryon's letter, and that the Collateral Manager's delay in directing a sale of the Defaulted Securities constituted a failure to fulfill its obligation to sell the Defaulted Securities. As reported on the most recent Monthly Report, the number of Defaulted Securities has increased since the May 26, 2015 Note Valuation Report.

22.     On August 4, 2015, the Collateral Manager sent a letter to the Trustee expressing certain concerns regarding South Tryon's demand that the Collateral Manager sell the Defaulted Securities. On August 14, 2015, the Collateral Manager sent to the Trustee a notice to "Investors in Triaxx Prime CDO 2006-1" (the "August 2015 Notice"), with the intent of notifying Noteholders of South Tryon's demand that the Collateral Manager direct the sale of the Defaulted Securities and stating certain concerns regarding

the sale of the Defaulted Securities. Upon request of the Collateral Manager, the Trustee sent the August 2015 Notice to Noteholders via the Depository Trust Company's LENS system and posted the August 2015 Notice to the Trustee's website.

23.     In its August 2015 Notice, the Collateral Manager stated that, based on its analysis, it believed that a sale of the Defaulted Securities would result in losses to the Issuer and related Collateral which would be primarily borne by Noteholders that are subordinate to the Class A-1 Notes. It also noted that a sale of the Defaulted Securities could result in the Noteholders not receiving the benefit of monies that might be recovered in certain litigations that had been commenced in respect of certain Defaulted Securities. The Collateral Manager invited Noteholders to inform the Collateral Manager of their position regarding the sale.

24.     In a series of communications between the Issuer and the Collateral Manager during September and October of 2015, the Issuer took the position that the Collateral Manager should liquidate the Defaulted Securities.

25.     On or around September 12, 2015, the Collateral Manager notified the Issuer that it was prepared to proceed with a sale of certain Defaulted Securities under Section 12.1(a)(ii) of the Indenture and was in the process of selecting a selling agent to effect the sale of the Defaulted Securities.

26.     On October 2, 2015, the Collateral Manager notified the Issuer that it was preparing the Defaulted Securities for sale, but that the details of the sale, including its timing and mechanics, were not yet confirmed and had not yet been disclosed to any Noteholders or market participants.

-8-

27.     Upon information and belief, on or about November 18, 2015, the Collateral Manager sent bid packages to potential bidders offering some of the Defaulted Securities for sale.

28.     On or around November 19, 2015, GS&C notified the Collateral Manager and the Issuer by e-mail that it had just become aware of the Collateral Manager's August 2015 Notice.  In its email, GS&C objected to the sale of Defaulted Securities on the basis, among others, that a sale would not be in the best interests of the Noteholders.  GS&C further requested that the Collateral Manager hold the Defaulted Securities pending the recoveries the Issuer was likely to obtain in the litigations.

29.     On or around November 20, 2015, counsel for GS&C sent a letter to the Collateral Manager, copying the Trustee, reiterating that it first became aware of the Collateral Manager's August 2015 Notice on November 18, 2015 and that it believed that a sale of the Defaulted Securities was improper.  GS&C noted that South Tryon was insisting the liquidation start on Monday, November 23, 2015, and took the position that the sale of the Defaulted Securities would not be in the best interests of the Issuer.  GS&C further stated that it reserved its rights and legal remedies in connection with the matters identified in its letter.

30.     On or around November 20, 2015, counsel for BlackRock and GoldenTree sent a letter to the Collateral Manager, copying the Trustee, stating that they objected to the sale of the Default Securities on the basis that the notice and timing of the sale was highly disadvantageous, and that the sale would adversely affect the value of the Notes. BlackRock and GoldenTree requested that the Collateral Manager desist from the proposed sale, and stated that if any sale of the Defaulted Securities were to occur, both BlackRock

and GoldenTree reserved their rights against all responsible parties, and would hold the Collateral Manager and the Trustee accountable should the sale proceed as scheduled.

31.     The Collateral Manager cancelled the sale of the Defaulted Securities in November 2015 based at least in part, upon information and belief, on the communications sent on the November 19 and 20 correspondence described above.

32.     On December 18, 2015, the Trustee forwarded a notice from the Collateral Manager to Noteholders stating that the Collateral Manager had received conflicting views from the Noteholders as to whether the Defaulted Securities should be sold under the terms of the Indenture.   In its Notice, the Collateral Manager solicited comments from all Noteholders concerning whether the Defaulted Securities should be sold.

33.     Also on December 18, 2015, counsel for South Tryon had a telephone call with counsel for the Trustee.  During that call, counsel for South Tryon indicated that it was considering steps that could be taken to effect the sale of the Defaulted Securities, notwithstanding the objections that had been received by other Noteholders.  Counsel for South Tryon informed the Trustee's counsel that one option under consideration was litigation in which the Collateral Manager and the Trustee would be named as defendants.

34.     As described above, the Trustee faces irreconcilable demands as to certain assets deposited under the Indenture.  On the one hand, South Tryon insists that the Defaulted Securities should be sold by the Collateral Manager and that the Trustee should facilitate such sale by releasing its liens on the Defaulted Securities and releasing such assets from its custody.  The Objecting Noteholders, on the other hand, object to a sale, and have threatened or suggested that the Trustee could be liable if it acts, at the direction of the Collateral Manager, to release and deliver the Defaulted Securities.

35.     The Trustee has no interest as a claimant in the Collateral Debt Securities that are the subject of this dispute, except to the extent of administrative fees and expenses owing to the Trustee by the Issuer and its costs and disbursements, including legal fees and expenses, with respect to this action, as may be awarded by the Court, may be payable from the sale of any of the Defaulted Securities.

36.     The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

### PLEA FOR RELIEF

**WHEREFORE**, the Trustee asks this Court:

(i)      to order the Interpleader Defendants to interplead and to settle all claims to the Defaulted Securities and the sale thereof between themselves and any other persons who claim or may claim an interest, beneficial or legal, in such Defaulted Securities and the sale thereof;

(ii)     for a judicial determination as to (a) whether certain of the Collateral Debt Securities are Defaulted Securities, and if so (b) whether the Collateral Manager is required to sell any such Defaulted Securities, and if so (c) when such a sale should be effectuated;

(iii)    to restrain Interpleader Defendants and all claiming through or acting with them, or claiming any interest in the Defaulted Securities, from commencing or prosecuting any separate proceeding against the Trustee concerning or relating to the issues in this action;

(iv)     to award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action, from any sale of Defaulted Securities; and

(v)     to award the Trustee such other and further relief as the Court may deem just,

proper and equitable.

Dated:  New York, New York
        December 31, 2015

ALSTON & BIRD LLP

By:  /s/ Michael E. Johnson
     Michael E. Johnson
     Louis A. Russo
     90 Park Avenue
     New York, New York
     (212) 210-9400
     michael.johnson@alston.com
     louis.russo@alston.com

     *Attorneys for Interpleader
     Plaintiff U.S. Bank National
     Association, solely in its
     capacity as Trustee*

-11-