**SCH**
**SCHINDLER COHEN & HOCHMAN**ᴸᴾ

100 Wall Street, 15th floor / New York, N.Y. 10005 / t.(212) 277 6300 / f.(212) 277 6333 / www.schlaw.com

Lisa C. Cohen
(212) 277 6320
lcohen@schlaw.com

**BY ELECTRONIC FILING AND HAND DELIVERY**                                     January 22, 2016

Hon. William H. Pauley III
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1920
New York, New York 10007-1312

              Re:    *U.S. Bank Nat'l Assoc. v. Triaxx Prime CDO 2006-1, Ltd.*, **15 Civ. 10172**

Dear Judge Pauley:

      I write as counsel to Interpleader Defendant Goldman, Sachs & Co., joined by counsel to Blackrock Financial Management, Inc. and Goldentree Asset Management LP (the "Junior Noteholders") in response to the January 18, 2016 letter submitted by Interpleader Defendant South Tryon, LLC ("South Tryon"). Because significant issues of material fact are in dispute about the proper interpretation of the documents that govern the underlying transaction (the "Transaction Documents"), as well as issues concerning the Junior Noteholders' defenses, summary judgment motions would be premature. The Junior Noteholders propose instead that the Court permit the parties to proceed with discovery, which would allow a full and fair hearing on these issues before considering motions that could be wasteful for the Court and the parties.

**I.**    **Discovery Is Necessary To Examine Whether The Collateral Manager Must Provide Direction To Sell The Securities At Issue**

      South Tryon's letter highlights the need for discovery in order to elucidate the meaning of § 12 of the Indenture, including the phrase "direction of the Collateral Manager" as set forth in the Indenture's § 12.1(a). That phrase either means (as South Tryon asserts) that the Collateral Manager ***must*** provide direction to sell within three years of the time that a Collateral Debt Security becomes a Defaulted Security or (as the Junior Noteholders assert) that the Collateral Manager ***may*** direct a sale of Defaulted Security. There is no dispute that, once the Collateral Manager directs the sale of a Defaulted Security, that sale ***shall*** occur pursuant to the language in § 12.1(a)(ii). But whether the Transaction Documents compel the Collateral Manager to direct a sale – automatically and without regard to whether it has determined that a sale is in the best interests of all Noteholders – is a critical question as to which a factual record needs to be developed.

      More specifically, § 12.1(a) of the Indenture provides generally that "the Issuer **will not sell** or otherwise dispose of any Collateral Debt Security" except that it can do so "upon the direction of the Collateral Manager to the Issuer and the Trustee." (Indenture § 12.1(a) (emphasis added).) Section 12.1 further states when the Issuer, upon receiving the Collateral Manager's direction, has discretion to sell (§ 12.1(a)(i) – the Issuer "*may* sell") and when it must follow that direction (§ 12.1(a)(ii) – the Issuer "*shall* sell") (emphases added). For Defaulted Securities, after the Collateral Manager's direction is provided, § 12.1(a)(ii) states that the Issuer "(ii) shall sell . . . any Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted Security . . . *provided* that any Defaulted Security not sold within

three years after such Collateral Debt Security becomes a Defaulted Security shall be deemed to have a Principal Balance of zero." (Indenture § 12.1(a)(ii).)  According to South Tryon, the phrase "shall sell" in § 12.1(a)(ii) requires the Collateral Manager to provide the direction to sell required by § 12.1(a) within three years of when Collateral Debt Security becomes Defaulted Security.  The Junior Noteholders disagree:  the language allows the Collateral Manager to determine when to direct a sale of a Defaulted Security, and, if such sale does not occur within the three year time frame, the Principal Balance for that Defaulted Security is deemed to be zero.

The Collateral Manager's determination as to whether (or not) to sell any Collateral Debt Security is governed by the Collateral Manager Agreement ("CMA") as well as the Indenture.[1]  Section 2(d) of the CMA states that the "Collateral Manager shall, subject to and in accordance with the Indenture and this Agreement," take certain actions, including that it may "(ii) **retain** any . . . Collateral Debt Security . . . ; or (iii) **sell** . . . any . . . Collateral Security . . . as permitted under the Indenture; or . . . (vii) **waive any default** with respect to a Collateral Debt Security; or (viii) vote to accelerate (or **rescind the acceleration of**) the maturity of any Defaulted Security; or . . . (xi) exercise any other rights and remedies with respect to any such Collateral Debt Security . . . or take any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be **in the best interests of the Noteholders**." (CMA § 2(d) (emphasis added).)  Section 2(a) of the CMA further provides that the Collateral Manager "shall exercise reasonable care, using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for itself and in a commercially reasonable manner consistent with practices and procedures followed by institutional managers of national standing in connection with the management of assets of the nature and the character of the Collateral Debt Securities and Eligible Investments."  It is not at all clear from the interplay between these agreements that, as South Tryon asserts, the Collateral Manager must direct the sale of Defaulted Securities if that sale would be contrary to the best interests of the Noteholders and inconsistent with industry custom and practice.

Further, the Collateral Manager has apparently long believed that it may decide whether and when to provide a direction to sell:  the vast majority of the defaults to the disputed securities were caused by ratings agency downgrades that occurred *in 2009*, and the Collateral Manager has not directed a sale in the intervening seven years.[2]  Indeed, the Collateral Manager spent considerable Trust resources to participate in litigation concerning the disputed securities ("Collateral Litigation") with the aim of maximizing recoveries on behalf of the Issuer and all Noteholders.  The Collateral Manager's actions pursuant to its interpretations were fully reported in monthly and quarterly reports delivered to Noteholders, *all* of whom apparently agreed for many years with those actions and interpretations.  Moreover, all Noteholders relied on such interpretations in making investment decisions, and the decision not to sell apparently benefitted

---

[1] Separate agreements executed contemporaneously and that are part of a single transaction are generally read together.  *See Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 CIV.8688 (WHP), 2004 WL 1119652, at *3 (S.D.N.Y. May 20, 2004) (Pauley, J.).  Here, the relevant agreements are not only part of a single transaction but they refer to one another and thus are clearly intended to be read together.

[2] Importantly, South Tryon has received all funds due under the Indenture's payment provisions.  Apparently South Tryon nonetheless seeks liquidation so as to receive the vast majority of the sales price in a lump sum – and to terminate the flow of cash generated by those securities and currently paid to both Senior and Junior Noteholders.

the Senior Noteholders.[3]  To the extent that South Tryon urges a new interpretation, the Junior Noteholders are entitled to explore the facts surrounding that interpretation, including the factual basis for that interpretation and the application of the defenses of waiver and estoppel.  These defenses may be significant here because the Junior Noteholders have effectively borne the cost of the Collateral Litigation, and the forced liquidation that South Tryon seeks would cause an overall loss to the Issuer of at least $80 million, which would also largely be borne by the Junior Noteholders.  Thus, a sale of the Collateral Debt Securities in response to South Tryon's current demands would work injustice on the Junior Noteholders.

## II.   Proposed Discovery Schedule

In the interests of judicial efficiency, the Court should not entertain South Tryon's summary judgment motion at this time and should instead permit discovery to determine, *inter alia*: (i) the intent of the drafters of the Transaction Documents regarding the meaning of the phrase "direction of the Collateral Manager" in § 12.1(a) of the Indenture; (ii) the interpretation that the Collateral Manager and Noteholders ascribed to that phrase since 2009 and communications concerning that phrase among Noteholders, the Trustee, the Collateral Manager, or the Issuer; (iii) the duties exercised by the Collateral Manager in connection with the disputed securities, including whether the Collateral Manager waived any default pursuant to CMA § 2(d)(vii) and determined that the Noteholders' best interests is to not sell the disputed securities, and industry practice in management of such securities; (iv) facts surrounding South Tryon's purchase of its Notes, including the price paid, dates of purchase, any analysis of the Notes' value, the decision to purchase the Notes, and its understanding of the Collateral Manager's long-held interpretation with respect to any direction regarding the disputed securities; (v) the identity of South Tryon's beneficial owner and facts concerning any sale of Notes by that entity or its affiliates; and (vi) the calculation of funds to be distributed before and after the proposed liquidation.  Expert discovery on the custom and practice of collateral managers in similar situations may also be necessary.  *See generally* FRCP 56(d); *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.").  The Junior Noteholders propose that the Court order discovery to be completed within nine months.

As we indicated at the initial conference on this matter, there is no urgency or need to have this matter resolved expeditiously.  The case should proceed in the normal course with discovery as outlined above before the parties engage in summary judgment briefing.

                                                     Respectfully submitted,

                                                     Lisa C. Cohen

cc:   Counsel of Record (*by ECF*)

---

[3] Among other things, the Collateral Manager has stated that its actions have resulted in "tens of millions of dollars inflowing to the Trusts," and it expects to receive substantial additional funds from related settlements.