UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. BANK NATIONAL ASSOCIATION,
*solely in its capacity as Trustee*,

                   Interpleader-Plaintiff,

   vs.

TRIAXX PRIME CDO 2006-1, LTD.; TRIAXX
ASSET MANAGEMENT LLC (f/k/a ICP
ASSET MANAGEMENT LLC); SOUTH
TRYON, LLC; GOLDMAN SACHS & CO.;
BLACKROCK FINANCIAL MANAGEMENT,
INC.; and GOLDENTREE ASSET
MANAGEMENT LP,

                   Interpleader-Defendants.

Case No. 1:15-cv-10172 (WHP)

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Jonathan E. Pickhardt
Blair A. Adams
Kimberly E. Carson
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Interpleader-Defendant
South Tryon, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    A.    Triaxx 06-1 And Its Service Providers ..................................................3

    B.    The Relevant Provisions Of The Indenture And The Collateral Management Agreement ..............................................................................4

    C.    The Collateral Manager Fails To Sell Defaulted Securities Within Three Years ...................................................................................................7

    D.    Notice Of The Breach And The Aborted November Auction ................8

    E.    The Trustee Files An Interpleader Action ...........................................9

ARGUMENT ....................................................................................................................10

I.    The Plain Terms Of The Indenture Require The Sale Of The Three Year Defaulted Securities ...........................................................................11

II.    Nothing In The CMA Or Indenture Permits The Collateral Manager's Breach................13

    A.    Section 7(f) of the CMA .....................................................................14

    B.    Collateral Manager Discretion ...........................................................15

III.    The Defenses Of Waiver, Equitable Estoppel And Laches Do Not Preclude Enforcement Of The Collateral Manager's Duties To Sell Three Year Defaulted Securities...........................................................................17

CONCLUSION..................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Beal Sav. Bank v. Sommer*,
  8 N.Y.3d 318 (2007) ...........................................................................................17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................................10

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*,
  773 F.3d 110 (2d Cir. 2014)...............................................................................10

*Cougentakis v. Strategic Media I, LLC*,
  No. 13 Civ. 8361, 2014 WL. 5809798 (S.D.N.Y. Nov. 4, 2014) .....................2, 19

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
  No. 13 CIV 5784 CM, 2015 WL 235241 (S.D.N.Y. Jan. 15, 2015) ...............18, 19

*Gorman v. Consol. Edison Corp.*,
  488 F.3d 586 (2d Cir. 2007)...............................................................................11

*Koninklijke Philips Elecs., N.V. v. Cinram Int'l, Inc.*,
  No. 08 Civ. 515, 2012 WL 4074419 (S.D.N.Y. Aug. 23, 2012) ..........................18

*Mastrovincenzo v. New York*,
  435 F.3d 78 (2d Cir. 2006).................................................................................11

*NML Capital, Ltd. v. Republic of Argentina*,
  699 F.3d 246 (2d Cir. 2012)...............................................................................18

*Readco, Inc. v. Marine Midland Bank*,
  81 F.3d 295 (2d Cir. 1996).................................................................................19

*Rojas v. Roman Catholic Diocese of Rochester*,
  660 F.3d 98 (2d Cir. 2011).................................................................................10

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
  691 F.2d 1039 (2d Cir. 1982).............................................................................10

*Sledge v. Kooi*,
  564 F.3d 105 (2d Cir. 2009)...............................................................................10

*TBA Global, LLC v. Fidus Partners, LLC*,
  15 N.Y.S.3d 769 (1st Dep't 2015).......................................................................14

**Rules / Statutes**

Fed. R. Civ. P. 56...............................................................................................10, 20

Interpleader-Defendant South Tryon, LLC ("South Tryon") respectfully submits this memorandum of law in support of its Motion for Summary Judgment, dated February 2, 2016, in the above-captioned interpleader action filed by interpleader-plaintiff U.S. Bank National Association ("U.S. Bank"), solely in its capacity as trustee (the "Trustee") for Triaxx Prime CDO 2006-1, Ltd. ("Triaxx 06-1" or the "Issuer").

## PRELIMINARY STATEMENT

This action stems from the failure of defendant Triaxx Asset Management, LLC ("Triaxx Asset Management" or the "Collateral Manager") to comply with its clear and unambiguous contractual obligations as collateral manager to interpleader-defendant Triaxx 06-1 to direct the sale of Defaulted Securities held by Triaxx 06-1.[1]  South Tryon, the senior Noteholder with the largest beneficial interest in Class A-1 Notes issued by Triaxx 06-1, moves for summary judgment at this early stage of the proceeding because the unambiguous terms of the Indenture applied to the undisputable facts present at the outset of this litigation are sufficient to resolve the dispute at issue.

The dispute presented in this interpleader action can be resolved based upon the plain terms of the Indenture that governs the operation of Triaxx 06-1.  At issue is a provision of the Indenture that provides protection to senior Noteholders by requiring that the Issuer sell Defaulted Securities—*i.e.*, securities that exhibit any of a number of attributes reflecting increased riskiness—within a three year period.  Specifically, Section 12.1(a) of the Indenture

---

[1]  Capitalized terms used but not defined herein shall have the meaning set forth in the Indenture, dated as of September 7, 2006 (the "Indenture"), among Triaxx 06-1, as issuer, Triaxx Prime CDO 2006-1, LLC, as co-issuer, and U.S. Bank (successor-in-interest to Bank of America, N.A. (successor-by-merger to LaSalle Bank National Association)), as trustee.  A true and correct copy of the Indenture is attached as Exhibit A to the Declaration of Jonathan E. Pickhardt in Support of South Tryon, LLC's Motion for Summary Judgment, dated February 2, 2016 ("Declaration of Jonathan E. Pickhardt" or "Pickhardt Dec."), submitted herewith.

provides that "the Issuer . . . shall sell (a) any Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted Security . . . ."

Because the Issuer is a special purpose vehicle with no employees, the Indenture contemplates that the sales of Defaulted Securities will be effected on behalf of the Issuer by the Collateral Manager.  Specifically, Section 12.1(b) of the Indenture provides that "[t]he Collateral Manager, on behalf of the Issuer, shall use commercially reasonable efforts to sell . . . each Defaulted Security . . . within the time periods (if any) specified in Section 12.1(a) . . . ."  It then goes on to specify the procedures to be employed by the Collateral Manager for such sales, which involve the Collateral Manager soliciting bids from at least three dealers and then selling the Defaulted Security "to the highest bidder."

Notwithstanding these clear provisions, Triaxx Asset Management has allowed Defaulted Securities to remain in Triaxx 06-1's portfolio for well over three years without its undertaking the sales efforts that are required by the Indenture.  At present, as tracked by the Trustee in monthly reports issued to investors—and confirmed by Bloomberg reports—out of the 85 total securities held by Triaxx 06-1, there are 63 securities that meet the definition of Defaulted Security, with 49 of those having been Defaulted Securities for three years or more (the "Three Year Defaulted Securities").

In July 2015, South Tryon notified Triaxx Asset Management of the Indenture breaches caused by its failure to sell Defaulted Securities.  While repeatedly conceding its contractual obligation to sell the Three Year Defaulted Securities—and, in fact, listing those securities for sale, only to abruptly cancel it on the morning it was scheduled to occur—Triaxx Asset Management has nonetheless failed to effect the sale of *any* Defaulted Securities.  Its continued breach was allegedly prompted by the fact that certain junior Noteholders have objected to any

proposed sales. Unsurprisingly, however, junior Noteholders are not empowered under the Indenture to direct the Collateral Manager to abstain from its duty to sell Defaulted Securities, especially since such sales are intended to protect *senior* Noteholders, not *junior* Noteholders.

In light of the ongoing dispute among South Tryon, the Collateral Manager, and certain junior Noteholders, the Trustee brought this interpleader action seeking a binding judicial decision as to the proper disposition (and requisite timing of such disposition) of the Three Year Defaulted Securities. South Tryon brings its motion for summary judgment at the outset of this case because the Indenture provisions that control this dispute are clear and unambiguous.

Thus, by this motion, South Tryon seeks an order requiring the Collateral Manager to effect the sale of the Three Year Defaulted Securities within ten Business Days thereof, in accordance with the protocols set forth in Section 12.1(b) of the Indenture.

## STATEMENT OF FACTS

### A.   Triaxx 06-1 And Its Service Providers

Triaxx 06-1 is a special purpose vehicle established to issue securities, in the form of notes called collateralized debt obligations ("CDOs" or "Notes"), to investors. (South Tryon, LLC's Rule 56.1(a) Statement of Material Facts, dated Feb. 2, 2016 ("SOMF") ¶ 1.) Triaxx 06-1 raised money by selling debt, in the form of Notes, and used the proceeds of that issuance to purchase assets held as collateral securing its obligations to Noteholders. (SOMF ¶¶ 2-3.) The assets purchased by Triaxx 06-1 are residential mortgage-backed securities ("RMBS"). (SOMF ¶ 3.) The principal and interest generated by the RMBS is used to pay Triaxx 06-1's expenses and make interest and principal payments to Triaxx 06-1's Noteholders. (SOMF ¶ 4.)

As a special purpose vehicle, Triaxx 06-1 has no employees, and its daily activities are managed by its service providers. (SOMF ¶ 5.) The Collateral Manager, Triaxx Asset Management (f/k/a ICP Asset Management LLC) is one of those service providers. (SOMF

3

¶¶ 6-8.)  Triaxx Asset Management is tasked with the selection and management of Triaxx 06-1's assets, among other related obligations.  (SOMF ¶ 9.)  Triaxx Asset Management is also tasked with fulfilling the duties assigned under the Indenture to Triaxx 06-1, which is a special purpose vehicle without any employees who could fulfill such tasks.  (SOMF ¶ 10.)  The Trustee, U.S. Bank, is another one of Triaxx 06-1's service providers.  (SOMF ¶ 11.)  The Trustee is the party that holds assets owned by Triaxx 06-1 as collateral securing the Issuer's obligations to Noteholders.  (SOMF ¶ 12.)  The Trustee is also tasked with certain ministerial functions including the disbursement of cash generated by Triaxx 06-1's portfolio of assets to pay the Issuer's expenses and make interest and principal payments to Noteholders.  (SOMF ¶ 13.)  The Collateral Administrator is a third service provider; it assists Triaxx 06-1 in preparing certain reports regarding the securities in Triaxx 06-1's portfolio (called Collateral Debt Securities), including Monthly Reports, which are issued monthly, and Note Valuation Reports, which are issued quarterly.  (SOMF ¶ 14.)

    B.    <u>The Relevant Provisions Of The Indenture And The Collateral Management Agreement</u>

The rights and obligations of the Issuer, the Collateral Manager, the Trustee, and the holders of the Notes issued by Triaxx 06-1 are set forth in a suite of transactional documents including the Indenture and the Collateral Management Agreement ("CMA"). [2]  Certain provisions of the Indenture impose limitations on the assets that the Issuer is permitted to own, which limit the risk that the Collateral Debt Securities will be insufficient to satisfy the Issuer's obligations to its Noteholders.

---

[2]  A true and correct copy of the CMA, dated as of September 7, 2006, among the Issuer and the Collateral Manager, is attached as Exhibit B to the Declaration of Jonathan E. Pickhardt. As noted *supra*, a true and correct copy of the Indenture is attached as Exhibit A to the Declaration of Jonathan E. Pickhardt.

Section 12.1 of the Indenture is one of those provisions. It limits the amount of risky assets owned by the Issuer by requiring that the Issuer, through its service providers, sell assets within a prescribed timeframe after they become Defaulted Securities. (*See* Indenture § 12.1(ii)(a).)[3] Defaulted Securities are defined under the Indenture as securities exhibiting a variety of different characteristics indicating an enhanced risk of loss, including—as relevant here—any Collateral Debt Security:

> that is rated "Ca" or "C" by Moody's or is rated "Caa3" by Moody's and is placed by Moody's on a watchlist for possible downgrade by Moody's or has no rating from Moody's but the Issuer has obtained a credit estimate from Moody's that such Collateral Debt Security has a Moody's Rating Factor of 10,000 or higher; [or]

> that is rated "CC," "D" or "SD" or below (or has had its rating withdrawn) by Standard & Poor's . . . .

(*Id.* § 1.1 at 13-14 (definition of "Defaulted Security," paragraphs (e) and (f).)) The Indenture requires that "the Issuer (upon direction of the Collateral Manager to the Issuer and the Trustee) . . . shall sell [] any Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted Security . . . ." (*Id.* § 12.1(a)(ii)(a).) The intended effect of this provision is to protect Triaxx 06-1's senior Noteholders because the proceeds of the mandated sales are paid through the principal payment waterfall, which requires the complete repayment of principal invested by senior Noteholders before any repayment of principal invested by junior

---

[3]   The Indenture also contains provisions that endeavor to limit the riskiness of investments that are purchased for the Issuer's portfolio in the first place, by imposing strict asset eligibility requirements for those assets. (*See, e.g.*, *id.* § 12.2(a)(5) (restricting investment to securities that either (a) have a public rating from at least one of Moody's or Standard & Poor's of "Aaa" or AAA, as applicable; or (b) is not publicly rated by either Moody's or Standard & Poor's, but has a rating from one of at least "Aa1" or "AA-," as applicable).)

Noteholders.  (*See id.* § 11(a)(ii).)  In return for such protections, senior Noteholders receive a lower interest payment on their investment than junior Noteholders.  (*See id.* § 2.2(b).)

Because the Issuer is a special purpose vehicle with no employees, it can only fulfill its obligation to sell Defaulted Securities with the assistance of the Collateral Manager, who is responsible for fulfilling the Issuer's duties under the Indenture, including acting on behalf of the Issuer in respect of the purchase and sale of assets.  In light of this fact, the Indenture specifically requires that "[t]he Collateral Manager, on behalf of the Issuer, shall use commercially reasonable efforts to sell . . . each Defaulted Security . . . required to be sold pursuant to Section 12.1(a) hereof within the time periods (if any) specified in Section 12.1(a) hereof . . . ."  (*Id.* § 12.1(b).)  The CMA reiterates that the Collateral Manager is required to "supervise and direct the sale . . . of Collateral Debt Securities in accordance with Article XII of the Indenture."  (CMA § 2(a); *see also id.* § 2(o) ("The Collateral Manager shall comply with such other duties and responsibilities as may be required of the Collateral Manager by the Indenture . . . ."); CMA §7(e) (prohibiting the Collateral Manager from taking any action that would "result in the Issuer violating the terms of the Indenture in any material respect"); CMA§ 2(a) ("The Collateral Manager shall comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder.").)

The Indenture also specifies the procedures that the Collateral Manager must employ in selling Defaulted Securities.  Section 12.1 of the Indenture provides:

> In respect of each Defaulted Security . . . , not less than five Business Days prior to the date on which a Defaulted Security . . . must be sold in accordance with Section 12.1(a) hereof, the Collateral Manager shall solicit *bona fide* bids for such Defaulted Security . . . from at least three Approved Dealers.  The Issuer shall sell . . . such Defaulted Security . . . to the highest bidder.

(Indenture § 12.1(b).)

      C.      The Collateral Manager Fails To Sell Defaulted Securities Within Three Years

On a monthly and quarterly basis, respectively, the Issuer, by and through the Collateral Administrator, prepares and distributes Monthly Reports and Note Valuation Reports, which include information pertaining to the performance of the Notes issued by Triaxx 06-1, as well as the Collateral Debt Securities in its portfolio.  (SOMF ¶ 14.)  Section 10.7 of the Indenture requires that the Issuer include "the identity of each Collateral Debt Security that is a Defaulted Security . . . , its principal amount, and, with respect to each Defaulted Security . . . the date on which it became Defaulted Security . . . ."  (Indenture § 10.7(a)(6).)

In September 2009, when assets held by Triaxx 06-1 started becoming Defaulted Securities on account of ratings downgrades, the Issuer began listing these securities in a section of the Monthly Reports and Note Valuation Reports entitled "Non-Performing Assets," where the Defaulted Securities are described as "D" or "DF" (meaning "Default") along with the date when such Collateral Debt Securities became Defaulted Securities.  (SOMF ¶¶ 23-24.)  Starting in September 2012, Defaulted Securities began reaching the end of the three-year period in which they were required to be sold by the Collateral Manager.  (SOMF ¶ 25.)  In October 2012, the Issuer added a column to the "Non-Performing Assets" section of the Monthly Reports and Note Valuation Reports for "Aged Defaulted Securities" and began listing Three Year Defaulted Securities as Aged Defaulted Securities under this header.  (SOMF ¶ 26.)

As of Monthly Report dated as of December 28, 2015 (the "December 2015 Monthly Report"), out of 85 Collateral Debt Securities held by Triaxx 06-1, 63 were listed as Defaulted Securities in the Non-Performing Assets section.  (SOMF ¶ 27.)  Of those 63 Defaulted Securities, 49 are Three Year Defaulted Securities.  (SOMF ¶ 28.)  According to the December 2015 Monthly Report, these 49 Three Year Defaulted Securities have a current principal balance

of $542,625,439.24.  (SOMF ¶ 28.)  The overwhelming majority of the Three Year Defaulted Securities became Three Year Defaulted Securities recently; 41 out of the 49 Three Year Defaulted Securities reached the three year anniversary of their becoming a Defaulted Security within 18 months of the filing of the Interpleader Complaint (and within only one year of the time when South Tryon alerted the Collateral Manager of its failure to fulfill its obligations, as discussed below).  (SOMF ¶ 29.)  The accuracy of the Defaulted Security and Three Year Defaulted Security designations in the Monthly Reports and Note Valuation Reports is verified by Bloomberg reports reflecting the ratings action that caused each of these Collateral Debt Securities to become a Defaulted Security, and the date on which that ratings action occurred. (SOMF ¶ 30.)

Notwithstanding that the lists of Defaulted Securities and Three Year Defaulted Securities was apparent from the face of the Monthly Reports and Note Valuation Reports, the Collateral Manager has failed to effect the sale of even a *single* Defaulted Security since 2009, resulting in the improper accumulation of Defaulted Securities in the Triaxx 06-1 portfolio. (SOMF ¶ 31.)

D.     Notice Of The Breach And The Aborted November Auction

South Tryon is a beneficial owner of $136,264,000 in original principal amount of Class A-1 Notes issued by Triaxx 06-1.  (SOMF ¶ 15.)  South Tryon is also the controlling certificateholder in Bank of America Funding 2012-R4 Trust, a resecuritization trust that holds approximately 82.64% of the Class A-1 Notes issued by Triaxx 06-1.  (SOMF ¶¶ 16-17.)

In a letter dated July 15, 2015, South Tryon alerted Triaxx Asset Management that its failure to direct the sale of the Three Year Defaulted Securities constituted a plain breach of its obligations under the Indenture and CMA.  (SOMF ¶ 32.)  South Tryon demanded that Triaxx Asset Management take immediate steps to sell the Three Year Defaulted Securities and to

complete those sales within 30 days.  (SOMF ¶ 33.)  In responding to South Tryon's letter, Triaxx Asset Management did not dispute South Tryon's characterization of the Collateral Manager's duty to sell the Three Year Defaulted Securities.  (SOMF ¶ 34.)  To the contrary, counsel for Triaxx Asset Management promised that the Collateral Manager would commence an "orderly liquidation" of the Three Year Defaulted Securities.  (SOMF ¶ 34.)

After four months of unexplained delay, on November 18, 2015, Triaxx Asset Management finally caused a liquidation agent, Dock Street Capital Management LLC, to list the Three Year Defaulted Securities for sale.  (SOMF ¶ 35.)  The sale was scheduled to proceed in two separate auctions, occurring on November 23, 2015 and November 24, 2015.  (SOMF ¶ 36.)  On the morning of November 23, 2015, immediately prior to the first of those auctions, the sale was abruptly cancelled.  (SOMF ¶ 37.)  Triaxx Asset Management has refused to relist the Three Year Defaulted Securities since the aborted November auction.  (SOMF ¶ 38.)

E.     The Trustee Files An Interpleader Action

On December 31, 2015, the Trustee filed an interpleader complaint (the "Interpleader Complaint") seeking a binding judicial decision as to the proper disposition (and requisite timing of such disposition) of the Three Year Defaulted Securities.  (Dkt. No. 1.)[4]  On January 18, 2016, South Tryon filed a pre-motion letter regarding its proposed motion for summary judgment. (Dkt. No. 34.)  On January 22, 2016, the Collateral Manager and junior Noteholders Goldman, Sachs & Co., Blackrock Financial Management, Inc. and Goldentree Asset Management LP (the "Objecting Noteholders") filed oppositions to South Tryon's pre-motion letter (Dkt. Nos. 42, 45), while the Trustee and the Issuer notified the Court that they took no position (Dkt. Nos. 43, 44).

---

[4]  References to "Dkt. No. _" herein shall refer to documents filed on the case docket for the above-captioned action, by document number.

On January 28, 2016, the parties filed answers to the interpleader complaint.  (Dkt. Nos. 46-48, 51-53.)  On January 29, 2016, a pre-motion conference was held in which the Court set a briefing schedule for this motion.

## ARGUMENT

A movant for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is considered material if "it might affect the outcome of the suit under the governing law." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  An issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted).  Once the movant demonstrates the absence of any genuine issue of material fact, the burden shifts to the opponent to "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

"Interpretation of indenture provisions is a matter of basic contract law." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982).  When interpreting a contract under New York law,[5] the court's "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114-15 (2d Cir. 2014) (alteration in original) (internal quotation marks omitted).

---

[5]   The Indenture is governed by New York law.  (*See* Indenture § 14.10.)

10

"Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *Mastrovincenzo v. New York*, 435 F.3d 78, 104 (2d Cir. 2006) (internal quotation marks omitted); *accord Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 596 n.9 (2d Cir. 2007) ("[C]anons of construction forbid contractual interpretations that lead to absurd results." (internal quotation marks omitted)).

## I.   THE PLAIN TERMS OF THE INDENTURE REQUIRE THE SALE OF THE THREE YEAR DEFAULTED SECURITIES

Summary judgment is appropriate at this early stage of the proceeding because the undisputable facts, applied to the clear and unambiguous terms of the Indenture, conclusively establish the Collateral Manager's obligation to effect the sale of the Three Year Defaulted Securities.

*First*, the Indenture is clear that the Issuer, by and through the Collateral Manager, is obligated to sell Defaulted Securities within three years.  Section 12.1(a)(ii) of the Indenture provides that "the Issuer (upon the direction of Collateral Manager . . .) . . . shall sell . . . any Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted Security."   (Indenture § 12.1(a)(ii).)   Section 12.1(b), in turn, requires that the Collateral Manager "use commercially reasonable efforts to sell . . . each Defaulted Security . . . required to be sold pursuant to Section 12.1(a)" within the same three-year time frame.  (*Id.* § 12.1(b).) Under Section 12.1(b), the Collateral Manager must do so in accordance with the following procedure:

> In respect of each Defaulted Security . . ., not less than five Business Days prior to the date on which a Defaulted Security . . . must be sold in accordance with Section 12.1(a) [*i.e.*, within three years after it became a Defaulted Security], the Collateral Manager shall solicit *bona fide* bids for such Defaulted Security . . . from at least three Approved Dealers.

(*Id.*)  Section 12.1(b) obligates the Issuer to sell the Defaulted Securities so auctioned "to the highest bidder."  (*Id.*)

*Second*, it is beyond reasonable dispute that each of the Three Year Defaulted Securities (a) constitutes a "Defaulted Security," as defined by the Indenture; and (b) became a Defaulted Security three or more years ago.  This is evidenced by, among other sources, the periodic Monthly Reports and Note Valuation Reports prepared for the Issuer by the Collateral Administrator that catalog each of Three Year Defaulted Securities in the "Non-Performing Assets" section and provide the date upon which they became Defaulted Securities. *See supra* at 7-8.  Their inclusion in that list is confirmed by the definition of "Defaulted Security" in the Indenture as, among other things, "any Collateral Debt Security . . . that is rated 'Ca' or 'C' by Moody's or is rated 'Caa3' by Moody's and is placed by Moody's on a watchlist for possible downgrade by Moody's" or "that is rated 'CC,' 'D' or 'SD' or below (or has had its rating withdrawn) by Standard & Poor's . . . ."  (Indenture § 1.1 at 13-14 (definition of "Defaulted Security").)  As reflected in Appendix A of the Declaration of Jonathan E. Pickhardt, Bloomberg reports confirm that each of the Three Year Defaulted Securities became a Defaulted Security on account of a requisite Moody's or Standard & Poor's rating action that occurred three or more years ago. *See supra* at 7-8 & Pickhardt Dec. App. A.

On these undisputable facts, coupled with the clear and unambiguous terms of Section 12.1 of the Indenture, the Court can make the following determination, which is sufficient to resolve the narrow controversy before it:  Because Section 12.1 of the Indenture imposes a clear contractual duty on the Issuer, through the Collateral Manager, to sell Defaulted Securities within three years after they became Defaulted Securities, and because each of the Three Year Defaulted Securities has been a Defaulted Security for three or more years, the Indenture

requires the sale by the Issuer, through the Collateral Manager, of the Three Year Defaulted Securities.  As such, South Tryon is entitled to an order that the Issuer, through the Collateral Manager or otherwise, shall sell the Three Year Defaulted Securities within ten Business Days of such order, in accordance with the protocols set forth in Section 12.1(b).  Given Triaxx Asset Management's repeated failure to comply with its obligation to sell Defaulted Securities within three years, South Tryon also requests an order that the Collateral Manager use commercially reasonable efforts, in accordance with the protocols set forth in Section 12.1(b), to sell all Defaulted Securities that are not Three Year Defaulted Securities within three years of the date when such Collateral Debt Securities became Defaulted Securities.

## II.   NOTHING IN THE CMA OR INDENTURE PERMITS THE COLLATERAL MANAGER'S BREACH

In its response to South Tryon's pre-motion letter, Triaxx Asset Management admits that sales pursuant to Section 12.1(a) are "mandatory" and further admits that under Section 12.1(a)(ii), "the Collateral Manager is required to put the three-year Defaulted Securities out for bid . . . ."  (Letter from Collateral Manager to Court at 2 (Jan. 22, 2016) (Dkt. No. 42) ("Collateral Manager Letter").)  However, Triaxx Asset Management claims that it cannot fulfill these obligations without running into conflict with two other requirements of the Indenture and the CMA: (i) the prohibition in the CMA on actions by the Collateral Manager that "adversely affect the interests of . . . the Noteholders in any material respect" (CMA § 7(f)) and (ii) the requirement in the Indenture that the Collateral Manager's efforts to sell the Three Year Defaulted Securities be "commercially reasonable" (Indenture § 12.1(b)).  (Collateral Manager Letter at 2.)  The Objecting Noteholders join Triaxx Asset Management's second argument, claiming that the Indenture is at least ambiguous as to whether or not the Collateral Manager has discretion not to sell Defaulted Securities within three years.  (*See* Letter from Objecting

Noteholders to Court at 1 (Jan. 22, 2016) (Dkt. No. 45) (claiming ambiguity in the phrase "direction of the Collateral Manager").) None of these provisions excuse the Issuer or Collateral Manager of their obligation to sell Defaulted Securities within three years, in accordance with the procedures set forth in Section 12.1(b).

A.   Section 7(f) of the CMA

The Collateral Manager's claim that sale of the Three Year Defaulted Securities would conflict with Section 7(f) of the CMA ignores the plain terms of that Section, and the CMA more generally.

*First*, Section 7(f) of the CMA expressly provides that "the Collateral Manager shall use commercially reasonable efforts to ensure that no action is taken by it . . . would . . . adversely affect the interests of . . . the Noteholders in any material respect (***other than the effect of such actions expressly permitted hereunder or under the Indenture***) . . . ." (CMA § 7(f) (emphasis added).) Because the sale of Defaulted Securities within three years is not only permitted under the Indenture, but *expressly required*, Section 7(f) of the CMA places no allowable limitation on the Collateral Manager's duty to sell the Three Year Defaulted Securities in accordance with the procedures set forth in Section 12.1(b) of the Indenture.

*Second*, Triaxx Asset Management ignores Section 2(a) of the CMA which expressly, and specifically, requires the Collateral Manager to "direct the sale . . . of Collateral Debt Securities . . . in accordance with Article XII of the Indenture . . . ." (CMA § 2(a).) Even if the general provision against taking actions that "adversely affect" Noteholder interest could be read to apply to the sale of Three Year Defaulted Securities—which it cannot—it would be superseded by the specific requirement in Section 2(a) of the CMA that the Collateral Manager abide by the requirements of Article XII of the Indenture, including the requirement in Section 12.1(a)(ii) and (b) that that Defaulted Securities be sold within three years. *See TBA Global,*

14

*LLC v. Fidus Partners, LLC*, 15 N.Y.S.3d 769, 776 (1st Dep't 2015) ("[W]e follow the longstanding rule that, where there [is] an inconsistency between a specific provision and a general provision of a contract . . . , the specific provision controls." (internal quotation marks omitted)).   In other words, none of the general Collateral Manager duties in the CMA can override the duty set forth in Section 12 of the Indenture to sell Defaulted Securities within three years, since the CMA is specifically subject to the requirements of that section.

*Third*, Triaxx Asset Management ignores numerous provisions in the CMA, including provisions in Section 7 itself, that prohibit the Collateral Manager from violating—or causing the Issuer to violate—the terms of the Indenture.   (*See* CMA §7(e) (prohibiting the Collateral Manager from taking any action that would "result in the Issuer violating the terms of the Indenture in any material respect"); *id.* § 2(a) ("The Collateral Manager shall comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder."); *id.* § 2(o) ("The Collateral Manager shall comply with such other duties and responsibilities as may be required of the Collateral Manager by the Indenture.").)   Since—as the Triaxx Asset Management admits—the Collateral Manager is required by Section 12.1(b) of the Indenture to place Defaulted Securities out for bid within three years, in accordance with the procedures set forth therein, it is likewise required to do so under the CMA.

B.     Collateral Manager Discretion

The arguments by Triaxx Asset Management and the Objecting Noteholders that discretion for the Collateral Manager to ignore the three-year sale requirements in Section 12.1(a) can be inferred from either the phrase "commercially reasonable efforts" or "direction of the Collateral Manager" also fail because they are directly contradicted by the plain terms of Section

12.1(b) itself, and would render the contrasting uses of mandatory and permissive language throughout Section 12.1(a) meaningless.

*First*, Section 12.1(b) of the Indenture unambiguously requires that "[i]n respect of each Defaulted Security . . . , not less than five Business Days prior to the date on which a Defaulted Security . . . must be sold in accordance with Section 12.1(a) hereof, the Collateral Manager ***shall solicit*** *bona fide* bids for such Defaulted Security . . . from at least three Approved Dealers." (Indenture § 12.1(b) (emphasis added).) It further requires that "[t]he Issuer ***shall sell*** . . . such Defaulted Security . . . to the highest bidder." (*Id.*) Thus Section 12.1(b) of the Indenture makes clear that the Collateral Manager's implementation of the auction and sale to the highest bidder is non-discretionary. The reference to "commercially reasonable efforts" is clearly intended to ensure that the Collateral Manager does not implement those required auction procedures in a commercially *un*reasonable manner—*e.g.*, holding an auction on Christmas Day. But, that does not permit the Collateral Manager to decide that the very procedures mandated by Section 12.1(b) are themselves commercially unreasonable and therefore refuse to fulfill them, such as by failing to list securities for sale within three years or refusing to sell them to the highest bidders (such as through utilizing an auction reserve price as Triaxx Asset Management claims to have been prepared to do in the November auctions, *see* Answer and Cross-Claim of Triaxx Asset Management ¶ 50 (Jan. 28, 2016) (Dkt. No. 53)). Nor is the phrase "direction of the Collateral Manager" in Section 12.1(a) a source of Collateral Manager discretion to avoid effecting sales of Three Year Defaulted Securities since Section 12.1(b) plainly requires the Collateral Manager to implement sales procedures and Section 2(a) of the CMA requires the manager to "direct the sale . . . in accordance with Article XII of the Indenture . . . ." (CMA § 2(a).)

*Second*, even if the "commercially reasonable efforts" or "direction of the Collateral Manager" phrases could somehow be read, in isolation, as permitting the Collateral Manager to not sell the Defaulted Securities within the required time period—which they cannot—this interpretation would be impermissible under standard principals of contract interpretation, which prohibit reading contractual provisions in a manner that render other provisions entirely superfluous. *See Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007) ("A reading of the contract should not render any portion meaningless."). Specifically, such an interpretation would render meaningless the contrasting uses of mandatory ("shall") and permissive ("may") language throughout Section 12.1(a) since it would render all such language permissive. (*Compare* Indenture § 12.1(a)(ii) ("Issuer . . . ***shall*** sell . . .") *with id.* § 12.1(a)(i) ("Issuer . . . ***may*** sell . . ."); *id.* § 12.1(a)(v) ("Issuer . . . ***may*** sell . . .") (emphasis added).) Further, to the extent the Objecting Noteholders claim (as they did in their pre-motion letter response) that the contrasting permissive and mandatory language in Section 12.1 is intended to reflect when the Issuer has discretion to ignore a direction from the Collateral Manager, this still renders those provisions meaningless since the CMA makes clear that it is the Collateral Manager that fulfills the duties of the Issuer under the Indenture. (*See* CMA § 2(a).) The Objecting Noteholders' interpretation would thus still be transforming all of the 12.1(a) provisions into provisions that apply at the discretion of the Collateral Manager regardless of whether permissive or mandatory language is used.

## III.   THE DEFENSES OF WAIVER, EQUITABLE ESTOPPEL AND LACHES DO NOT PRECLUDE ENFORCEMENT OF THE COLLATERAL MANAGER'S DUTIES TO SELL THREE YEAR DEFAULTED SECURITIES

Recognizing the abject weakness of their contractual arguments, the Objecting Noteholders have now raised a number of affirmative defenses to enforcement of the Collateral Manager's contractual obligation to sell Defaulted Securities within three years, including waiver,

estoppel, and laches.  Even putting aside the total absence of factual allegations supporting these defenses, the Objecting Noteholders equitable arguments are also doomed to fail for numerous reasons.

As a preliminary matter, the Objecting Noteholders' equitable defenses are plainly barred by the unambiguous language of the Indenture itself.  Section 5.12 of the Indenture, titled "Delay or Omission Not Waiver," unequivocally provides that "[n]o delay or omission . . . of any Senior Noteholder to exercise any right or remedy accruing upon any Indenture Event of Default shall impair any such right or remedy or constitute a waiver of any such Indenture Event of Default or an acquiescence therein."  (Indenture § 5.12.)  Similarly, the CMA provides that "[n]either the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver hereof . . . ."  (CMA § 24.)  "New York courts recognize and enforce such non-waiver clauses."  *Koninklijke Philips Elecs., N.V. v. Cinram Int'l, Inc.*, No. 08 Civ. 515, 2012 WL 4074419, at *10 (S.D.N.Y. Aug. 23, 2012).  In the face of these clear contractual provisions, the equitable defenses of the Objecting Noteholders are futile.

Even if the non-waiver provisions in the Indenture and CMA did not bar the Objecting Noteholders' equitable defenses—which they do—such defenses are legally deficient because they would variously require a showing of an unmistakable intent to waive rights,  a false representation or concealed facts, or an unreasonable delay in enforcement or rights, none of which exist in this case.  *See, e.g., NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 261 (2d Cir. 2012) (laches requires, *inter alia*, a "delay in asserting a claim for relief despite the opportunity to do so"); *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, No. 13 CIV. 5784 CM, 2015 WL 235241, at *4 (S.D.N.Y. Jan. 15, 2015) (waivers must be, *inter alia*, "clear, unmistakable

and without ambiguity"); *Cougentakis v. Strategic Media I, LLC*, No. 13 Civ. 8361, 2014 WL 5809798, at *3 (S.D.N.Y. Nov. 4, 2014) (citing *Readco, Inc. v. Marine Midland Bank*, 81 F. 3d 295, 301-302 (2d Cir. 1996)) (Pauley, J.) (equitable estoppel must include, *inter alia*, proof of "a false representation or concealed material facts").

*First*, the Objecting Noteholders are unable to point to any conduct reflecting an unmistakable intent to waive the provisions of the Indenture governing the requirements to sell Three Year Defaulted Securities.  At best, the Objecting Noteholders could claim some degree of inaction with respect to the sales yet "waiver . . . may not be inferred from mere silence or inaction."  *Flo & Eddie, Inc.*, 2015 WL 235241, at *4  (internal quotation marks omitted).  This is especially the case where the governing documents expressly contemplate such delays, and provide that they do not constitute waivers.  (*See* Indenture § 5.12; CMA § 24.)  Thus, as a matter of common law and contract, there has been no waiver of the right to enforce the provision requiring the sale of the Three Year Defaulted Securities.

*Second,* there is no allegation—nor could there be—that anyone concealed or misrepresented any material facts to the Objecting Noteholders, as required for equitable estoppel defense.  To the contrary, the Objecting Noteholders plainly had knowledge of the true facts—and the very same facts to which South Tryon was privy—that Triaxx Asset Management had failed to sell Defaulted Securities within three years of such securities becoming Defaulted Securities.  This fact was apparent on the face of the Monthly Reports and Note Valuation Reports, which were available to all investors.  *See supra* at 7-8.  That the Objecting Noteholders may have *misinterpreted* those true facts is not the same as someone having misrepresented or concealed them. Without proof of such a misrepresentation or concealment, the Objecting Noteholders' equitable estoppel defense fails as well.

19

*Third,* there has been no unreasonable delay in the enforcement of the Collateral Manager's obligations to sell the Three Year Defaulted Securities, as required for a laches defense.  Rather, as described above, only a small number of Three Year Defaulted Securities had passed their three-year anniversary as Defaulted Securities by mid 2014.  The vast majority (including 41 of the 49 Three Year Defaulted Securities) passed that three year anniversary less than 12 months prior to South Tryon's July 2015 letter to the Collateral Manager, Trustee and Issuer complaining about the Collateral Manager's breach.  It was hardly unreasonable for senior Noteholders to have waited until the Collateral Manager's breach was impacting a material number of Defaulted Securities before undertaking the burden and expense of taking steps to enforce the Collateral Manager's duties.  This is especially the case in light of provisions in the Indenture which preclude Noteholders from initiating any direct actions (*see* Indenture § 5.2 ("Limitation on Suits")) as well as provisions allowing senior Noteholders to delay their enforcement of rights until such enforcement will be most "expedient."  (*See id.* § 5.2 ("Every right and remedy given by this Article V [*i.e.,* covering Events of Defaults] or by law to the . . . Senior Noteholders may be exercised from time to time, and as often as may be deemed expedient . . . .").)  It was thus not unreasonable for senior Noteholders to have enforced the Collateral Manager's duties when they did, and any laches defense fails.

## <u>CONCLUSION</u>

For the foregoing reasons, South Tryon's Motion for Summary Judgment should be granted, and South Tryon awarded relief pursuant to Rule 56 of the Federal Rules of Civil Procedure, as set forth in the accompanying [Proposed] Order on Summary Judgment, including an order:

(a) declaring that the Three Year Defaulted Securities, listed in Appendix A of the Declaration of Jonathan E. Pickhardt, constitute Defaulted Securities that became Defaulted Securities three or more years prior to the present date;

(b) ordering that the Issuer, through the Collateral Manager or otherwise, shall effect the sale of the Three Year Defaulted Securities within ten Business Days thereof, in accordance with the procedures set forth in Section 12.1(b) of the Indenture; and

(c) ordering that the Collateral Manager use commercially reasonable efforts, in accordance with the protocols set forth in Section 12.1(b) of the Indenture, to sell all Defaulted Securities that are not Three Year Defaulted Securities within three years of the date when such Collateral Debt Securities became Defaulted Securities.

DATED:       New York, New York              Respectfully submitted,
             February 2, 2016
                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP

                                             By: _____
                                                 Jonathan E. Pickhardt
                                                 *jonpickhardt@quinnemanuel.com*
                                                 Blair A. Adams
                                                 *blairadams@quinnemanuel.com*
                                                 Kimberly E. Carson
                                                 *kimberlycarson@quinnemanuel.com*

                                                 51 Madison Avenue, 22nd Floor
                                                 New York, New York 10010
                                                 (212) 849-7000

                                                 *Attorneys for Interpleader-Defendant*
                                                 *South Tryon, LLC*