UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
U.S. BANK NATIONAL ASSOCIATION,    :
*solely in its capacity as Trustee*,
                                    :
              Plaintiff,
                                    :          15cv10172
         -against-
                                    :          MEMORANDUM & ORDER
TRIAXX PRIME CDO 2006-1, LTD. *et al.*,
                                    :
              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
WILLIAM H. PAULEY III, District Judge:

      U.S. Bank National Association ("U.S. Bank"), in its capacity as trustee for Triaxx Prime CDO 2006-1, Ltd. ("Triaxx 2006-1"), initiated this interpleader action. Interpleader-Defendant South Tryon, LLC ("South Tryon"), the most senior noteholder in Triaxx 2006-1, moves for summary judgment seeking, among other things, an order directing the sale of certain collateral held by Triaxx 2006-1. South Tryon's motion is opposed by Interpleader-Defendants Goldman Sachs & Co. ("Goldman"), Blackrock Financial Management, Inc. ("Blackrock"), and GoldenTree Asset Management ("GoldenTree," and, collectively, the "Other Senior Noteholders"), as well as Triaxx Asset Management, LLC (the "Collateral Manager"). South Tryon's motion for summary judgment is granted.

## BACKGROUND

I.   Triaxx 2006-1

      Triaxx 2006-1 is a Cayman Islands special-purpose investment vehicle that issued approximately $2,667,000,000.00 of securities in the form of notes known as collateralized debt obligations ("CDOs"). (South Tryon Rule 56.1 Statement of Material Facts ("ST SOMF") ¶ 1; Pickhardt Decl. Ex. C (Offering Circular) at 2.) The sale of those notes funded Triaxx 2006-1's

purchase of residential mortgage-backed securities ("RMBS"). The principal and interest generated by the RMBS pay Triaxx 2006-1's expenses, and fund interest and principal payments to Triaxx 2006-1's noteholders. (ST SOMF ¶¶ 2–4.) Triaxx 2006-1 issued notes with five different classes (or "tranches") of seniority in a veritable tower of debt. (Pickhardt Decl. Ex. C (Offering Circular) at 2.) Class A-1 notes generally have priority of payment over Class A-2 notes; Class A-2 notes have priority over Class B notes; and so on. (Collateral Manager Rule 56.1 Statement of Material Facts ("CM SOMF") ¶ 3.) This "waterfall" structure requires the complete repayment of senior noteholders' principal before any repayment of principal invested by junior noteholders. (Pickhardt Decl. Ex. A § 11(a)(ii).) Because of this increased risk, more junior noteholders are entitled to receive higher interest payments. (Pickhardt Decl. Ex. A § 2.2(b).)

     Triaxx 2006-1's operations are governed by two agreements: the "Indenture" and the "Collateral Management Agreement" ("Management Agreement" or "CMA" and, together with the Indenture, the "Governing Documents"). Under the Governing Documents, Triaxx 2006-1's activities are managed by service providers. (ST SOMF ¶ 5.) One such service provider, the Collateral Manager, is charged with selecting and managing the RMBS held as collateral, and fulfilling other duties assigned under the Indenture. (ST SOMF ¶¶ 9–10.) The Management Agreement sets forth general mandates for the Collateral Manager, requiring it to:

> Perform its duties . . . in accordance with the terms and conditions of the [Governing] Documents . . . [and] exercise reasonable care, using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for itself and in a commercially reasonable manner consistent with practices and procedures followed by institutional managers of national standing in connection with the management of assets of the nature and the character of the Collateral Debt Securities . . . . (CMA § 2(a)).

Further, the Collateral Manager:

> shall endeavor, subject to (i) the standard of care described in Section 2(a), (ii) the requirements of the Indenture, and (iii) the limitations under the Advisers Act, to manage the pool of collateral in a manner that will permit a timely performance of all payment obligations of [Triaxx 2006-1] under the Indenture in accordance with the priorities set forth therein . . . . (CMA § 2(b).)

The Management Agreement also provides that the Collateral Manager:

> shall use commercially reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would . . . adversely affect the interests of the Trustee [or] the Noteholders in any material respect (other than the effect of such actions expressly permitted hereunder or under the Indenture). (CMA § 7.)

Moreover, in a section directly applicable to this dispute, the Indenture states that "[Triaxx 2006-1] (upon direction of the Collateral Manager to [Triaxx 2006-1] and the Trustee) . . . shall sell [] any Defaulted Security[1] . . . within three years after such Collateral Debt Security[2] becomes a Defaulted Security . . . ." (Indenture § 12.1(a)(ii)(a).)  In describing how such a sale must be executed, the Indenture states that "[t]he Collateral Manager, on behalf of [Triaxx 2006-1], shall use commercially reasonable efforts to sell . . . each Defaulted Security . . . required to be sold pursuant to Section 12.1(a) hereof within the time periods (if any) specified in Section 12.1(a) hereof . . . ." (Indenture § 12.1(b).)  Section 12.1(b) provides further that:

> In respect of each Defaulted Security . . . , not less than five Business Days prior to the date on which a Defaulted Security . . . must be sold in accordance with Section 12.1(a) hereof, the Collateral Manager shall solicit bona fide bids for such

---

[1] "Defaulted Securities" are defined under the Indenture as, among other things, RMBS held by Triaxx 2006-1 that are: (1) rated below certain specified levels by Moody's; (2) unrated by Moody's and have received a certain credit estimate from Moody's; or (3) rated below certain specified levels (or have had their ratings withdrawn) by Standard & Poor's. (Indenture § 1.1 at 13–14, ¶¶ (e)–(f).)

[2] "Collateral Debt Security" refers to the RMBS that collateralize Triaxx 2006-1.

> Defaulted Security . . . from at least three Approved Dealers. [Triaxx 2006-1] shall sell . . . such Defaulted Security . . . to the highest bidder.

(Indenture § 12.1(b).) The Management Agreement is clear that the Collateral Manager must abide by the Indenture's directions regarding sales of Defaulted Securities. (See CMA § 7(e) ("[T]he Collateral Manager . . . shall not intentionally or with reckless disregard take any action, which would . . . result in [Triaxx 2006-1] violating the terms of the Indenture in any material respect."); (CMA § 2(a) (The Collateral Manager must "supervise and direct the sale . . . of Collateral Debt Securities in accordance with Article XII of the Indenture."); (CMA § 2(a) ("The Collateral Manager shall comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder.").)

Section 10.7 of the Indenture also requires Triaxx 2006-1 to issue monthly reports summarizing the performance of its collateral (the "Monthly Reports"). Beginning in September 2009, the Monthly Reports listed certain RMBS as Defaulted Securities. (ST SOMF ¶¶ 23–24.) After three years, the Monthly Reports listed those RMBS as "Aged Defaulted Securities" (also referred to as "Three Year Defaulted Securities"). (ST SOMF ¶ 26.) As of the December 28, 2015 Monthly Report, 49 out of 85 RMBS held by Triaxx 2006-1 were identified as Aged Defaulted Securities, with a current principal balance of $542,625,439.24. (ST SOMF ¶¶ 27–28.)

None of the Aged Defaulted Securities have been sold by the Collateral Manager. However, the Collateral Manager asserts that its ongoing litigation on behalf of Triaxx 2006-1 has and will recover tens of millions of dollars for its investors. (Calamari Aff. ¶¶ 22–23.)

4

Moreover, the Defaulted Securities continue to receive contractual payments of some principal and interest, which are paid to noteholders. (Calamari Aff. ¶ 24.)

II. South Tryon's Request

South Tryon is a beneficial owner of $136,264,000 in original principal amount of Triaxx 2006-1 Class A-1 Notes. South Tryon is also the controlling certificateholder in a resecuritization trust that owns approximately 82.64% of Triaxx 2006-1's Class A-1 Notes. (ST SOMF ¶¶ 15–17).[3] Goldman and Blackrock hold Triaxx 2006-1 Class A-2 and Class B notes. (Senior Noteholders' Statement of Material Facts ("SN SOMF") ¶ 43.) GoldenTree holds Class A-2 notes. (SN SOMF ¶ 44.)

In July 2015, South Tryon demanded that the Collateral Manager abide by the Governing Documents and direct the sale of the Three Year Defaulted Securities, and that such sale occur within 30 days. (ST SOMF ¶¶ 32–33.) Responding to that alert, the Collateral Manager engaged a liquidation agent to list the Three Year Defaulted Securities for sale in two separate auctions scheduled for November 23 and 24, 2015. (ST SOMF ¶¶ 35–36.) Prior to the auctions, the Other Senior Noteholders objected to any proposed sale. (Calamari Aff. ¶ 6.) The Collateral Manager then cancelled the auctions. (ST SOMF ¶ 37.) In view of the dispute between South Tryon and the Other Senior Noteholders, the Trustee filed this interpleader action on December 31, 2015, seeking a declaratory judgment regarding the proper disposition of the Three Year Defaulted Securities. (ECF No. 1.)

---

[3] A "resecuritization trust" is also referred to as a CDO-squared. It "is identical to a CDO except [that u]nlike the CDO, which is backed by a pool of [RMBS,] CDO-squared arrangements are backed by CDO tranches." Collateralized Debt Obligation Squared (CDO-Squared) Definition, Investopedia http://www.investopedia.com/terms/c/cdo2.asp#ixzz47JtRoZmD.

## LEGAL STANDARD

Summary judgment is warranted when a moving party shows that "there is no genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cortes v. MTA New York City Transit, 802 F.3d 226, 230 (2d Cir. 2015). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 39–40 (2d Cir. 2015) (citing Anderson, 477 U.S. at 248). "[W]here the non[-]moving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by point[ing] to an absence of evidence to support an essential element of the non[-]moving party's case." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) (internal citations and quotations omitted).

"Interpretation of indenture provisions is a matter of basic contract law." Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982). Under New York law, a court's "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., 773 F.3d 110, 113–14 (2d Cir. 2014) (alteration in original) (internal quotation marks omitted). A contract's "words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted). Issues of contractual interpretation can be resolved on a motion for summary judgment when "the contract is unambiguous with respect to the question disputed by the parties." Law

6

Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010) (internal quotation marks omitted).

## DISCUSSION

South Tryon seeks an order: (1) declaring that the Three Year Defaulted Securities constitute Defaulted Securities under the indenture and that they became Defaulted Securities more than three years ago; (2) directing Triaxx 2006-1, through the Collateral Manager or otherwise, to effect the sale of the Three Year Defaulted Securities within ten business days, in accord with Section 12.1(b) of the Indenture; and (3) ordering that the Collateral Manager use commercially reasonable efforts, in accord with Section 12.1(b) of the Indenture, to sell any future Three Year Defaulted Securities within three years of the date when they become Defaulted Securities.[4] The Collateral Manager and other Senior Noteholders oppose South Tryon's motion, arguing that there are material issues of fact regarding the Collateral Manager's obligations under the Governing Documents. The parties agree that the Governing Documents should be interpreted under New York law.

I. The Indenture

South Tryon's argument that the plain language of the Indenture mandates the Collateral Manager to effect the sale of the Three Year Defaulted Securities is compelling. The relevant language is replete with mandatory terms explaining what the Collateral Manager "shall" do and is "required" to do. Section 12.1(a)(ii) of the Indenture provides that "[Triaxx

---

[4] South Tryon's request to have the securities sold within 10 days (as opposed to some other time frame) is somewhat arbitrary. Nevertheless, South Tryon asserts that it is reasonable in view of the Collateral Manager's ability to quickly effectuate a sale. (May 3, 2016 Tr. at 16:11–18:10.) The Collateral Manager describes the proposed 10-day deadline as "extreme." (May 3, 2016 Tr. at 33:8–33:23.) Based on the proffers of counsel during oral argument and the record on summary judgment, this Court finds that 30 days should be a sufficient time frame for the Collateral Manager to effect a sale.

7

2006-1] (upon the direction of Collateral Manager . . .) . . . <u>shall sell</u> . . . any Defaulted Security . . . within three years after such Collateral Debt Security became a Defaulted Security." (Indenture § 12.1(a)(ii) (emphasis added).) Next, Section 12.1(b) states that "[t]he Collateral Manager . . . <u>shall</u> use commercially reasonable efforts to sell . . . each Defaulted Security . . . <u>required to be sold</u> pursuant to Section 12.1(a) [] in accordance with the following procedures." (Indenture § 12.1(b) (emphasis added).) The Indenture puts the "following procedures" in place:

> In respect of each Defaulted Security . . . , not less than five Business Days prior to the date on which a Defaulted Security . . . <u>must be sold in accordance with Section 12.1(a)</u>[], the Collateral Manager <u>shall</u> solicit bona fide bids for such Defaulted Security . . . from at least three Approved Dealers. [Triaxx 2006-1] shall sell . . . such Defaulted Security . . . to the highest bidder.

(Indenture § 12.1(b) (emphasis added).) In other words, the Indenture requires the Collateral Manager to sell any Defaulted Security within three years of it becoming a Defaulted Security, using "commercially reasonable efforts" to sell those securities in accord with the directions set forth by the Indenture (<u>i.e.</u>, soliciting bids from at least three dealers and selling to the highest bidder). The mandatory nature of these commands becomes even clearer when juxtaposed with Section 12.1(a)(i) of the Indenture, which describes scenarios when the Collateral Manager "<u>may</u> sell" a Defaulted Security. Thus, use of the mandatory "shall" in Section 12.1(a)(ii)—as opposed to the permissive "may" in Section 12.1(a)(i)—leaves no room for ambiguity.

The Collateral Manager asserts that such a reading "would effectively nullify the 'commercially reasonable' standard" set forth in Section 12.1(1)(b). (Collateral Manager Br. at 14.) But "commercially reasonable" is used to describe the "efforts" that the Collateral Manager "<u>shall</u>" take to sell a Three Year Defaulted Security within the confines of the procedures set

8

forth therein. Interpreting "commercially reasonable" to permit the Collateral Manager to sell a Three Year Defaulted Security at its own discretion would nullify the mandatory command that it "shall" sell such securities within a certain time period. Similarly, the Indenture's proviso that "any Defaulted Security not sold within three years . . . shall be deemed to have a Principal Balance of zero" does not indicate that the Collateral Manager has unfettered discretion to refrain from selling a Defaulted Security within three years. To the contrary, it is entirely consistent with the Indenture's express recognition that the Collateral Manager need not sell a Defaulted Security if, after following the procedures in Section 12.1(b), it "does not receive any bid on such Defaulted Security." (Indenture § 12.1(b).) Moreover, the fact that such a sale must take place "upon the direction of Collateral Manager" does not give the Collateral Manager discretion to not sell a Defaulted Security within three years. Because Triaxx 2006-1 is a special purpose vehicle with no employees, <u>all</u> of its actions must be taken upon the direction of one of its service providers.

      The cases cited by the Collateral Manager and the Other Senior Noteholders do not undermine South Tryon's argument. For example, the Collateral Manager cites <u>MBIA Ins. Corp. v. Patriarch Partners VIII, LLC</u>, 842 F. Supp. 2d 682 (S.D.N.Y. 2012) for the proposition that the issue of whether a collateral manager's conduct is "commercially reasonable" is a "triable issue of fact" inappropriate for resolution on summary judgment. But <u>MBIA</u> is inapposite. That case concerned a collateral manager's obligation "to use 'commercially reasonable efforts' as soon as 'reasonably practicable' to seek ratings on [certain n]otes." <u>MBIA</u>, 842 F. Supp. 2d at 716. Here, by contrast, the Indenture commands the sale of a Defaulted Security within a certain time frame—three years. The Indenture further restrains the

Collateral Manager's discretion by setting forth the precise manner in which those securities must be sold (i.e., soliciting bids from at least three dealers and selling to the highest bidder). It is within those parameters that the Collateral Manager's actions must be commercially reasonable.

II. The Management Agreement

"Under New York law, all writings forming part of a single transaction are to be read together." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); see also Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 00-cv-8688(WHP), 2004 WL 1119652, at *3 (S.D.N.Y. May 20, 2004) (collecting cases). Relying on that principle, the parties opposing South Tryon's motion argue that the Management Agreement justifies the Collateral Manager's decision not to sell the Three Year Defaulted Securities. Specifically, they point to the Management Agreement's mandate that the Collateral Manager "use commercially reasonable efforts" to avoid actions that "adversely affect the interest of . . . the Noteholders in any material respect (other than the effect of such actions expressly permitted . . . under the Indenture)." (CMA § 7.) But the parenthetical language in Section 7 of the Management Agreement expressly recognizes that certain obligations in the Indenture might contravene the general obligation to avoid actions adversely affecting noteholders' interests. The same is true with respect to other provisions of the Management Agreement. (See CMA § 2(d)(xi) ("The Collateral Manager shall . . . take any other action <u>consistent with the terms of the indenture</u> which the Collateral Manager reasonably believes to be in the best interests of the Noteholders.") (emphasis added); CMA § 2(a) ("The Collateral Manager, in performing its duties under the Operative Documents shall exercise reasonable care, using a degree of skill and attention no less

than that which the Collateral Manager exercises with respect to comparable assets that it manages for itself and in a commercially reasonable manner . . . . <u>The Collateral Manager shall comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder</u>.") (emphasis added).)

Allowing these general provisions of the Management Agreement to override the specific commands of the Indenture would contravene "the common (and commonsensical) rule that a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision . . . ." <u>Capital Ventures Int'l v. Republic of Argentina</u>, 652 F.3d 266, 271 (2d Cir. 2011); see also <u>Good Hill Master Fund, L.P. v. Deutsche Bank, AG</u>, No. 600858/2010, Dkt. 231, 6-8 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 3, 2016) (characterizing a party's avoidance of clear contractual obligations based on a general duty to act "in a commercially reasonable manner" as "a remarkable feat of legerdemain"). Moreover, the Collateral Manager's general duty to not adversely affect Triaxx 2006-1's noteholders does not mean that the actions taken by the Collateral Manager must always benefit all noteholders equally. To the contrary, investors purchase from different tranches of CDOs precisely because they offer different risks and rewards. Section 12.1(a)(ii) seems to be designed to protect the most senior noteholders (who received lower interest payments) in the event that Triaxx 2006-1's collateral deteriorated. While such a provision may disadvantage more junior noteholders where, as here, there are

numerous defaulted securities, those concerns do not permit this Court or the Collateral Manager to rewrite the Indenture.[5]

## CONCLUSION

South Tryon, LLC's motion for summary judgment (ECF No. 57) is granted. This Court hereby: (1) declares that the Three Year Defaulted Securities listed in Appendix A of the Declaration of Jonathan E. Pickhardt (ECF No. 60), constitute Defaulted Securities and became Defaulted Securities three or more years prior to the date of this Memorandum & Order; (2) directs Triaxx Prime CDO 2006-1, Ltd., through its collateral manager Triaxx Asset Management, LLC, to effect the sale of the Three Year Defaulted Securities within thirty days, in accord with Section 12.1(b) of the Indenture; and (3) orders Triaxx Asset Management, LLC to effect the sale any future Three Year Defaulted Securities within three years of the date when they become Defaulted Securities in accord with the procedures set forth in Section 12.1(b) of the Indenture.

---

[5] The Other Senior Noteholders also rely on N.Y. U.C.C. § 9-610(b), which states that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." But the UCC is not instructive here, as this case is about contractual obligations under the Indenture, not about the exercise of a secured creditor's remedies.

The Clerk of Court is directed to close this case, without prejudice to any application to reopen so long as such an application is made within 30 days of this Memorandum and Order. Any such application should explain what relief the applicant seeks.

Dated: June 23, 2016
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.